IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN OPEN COURT
U.S.D.C. - Atlanta

MAR 3 1 2021

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Information |
| *v.* | No. 1:21-CR-97 |
| ROBERT WHITLEY a/k/a MR. BOB | |

THE UNITED STATES ATTORNEY CHARGES THAT:

### Count One

(18 U.S.C. § 2314 –Interstate Transportation of Stolen Property)

### Background

1. At all times relevant to this Information:

a. Defendant **ROBERT WHITLEY a/k/a MR. BOB** ("R. WHITLEY") resided in Atlanta, Georgia in the Northern District of Georgia.

b. Noni Whitley ("N. Whitley") was a resident in and around Atlanta, Georgia in the Northern District of Georgia. N. Whitley is one of R. WHITLEY's daughters.

c. Closeout Express LLC ("Closeout Express") was a Georgia corporation that was first registered with the Georgia Secretary of State on or about October 1, 2013. Closeout Express's principal place of business was a warehouse located on White Street SW in Atlanta, Georgia. **R. WHITLEY** and N. Whitley are listed as the organizers and managers of Closeout Express. **R. WHITLEY** was the owner and operator of Closeout Express. Closeout Express was in the business of selling stolen over-the-counter ("OTC") medications,

shaving razors, oral care products, health and beauty aids, and other retail products.

d.  Essential Daily Discounts was an online entity operated by **R. WHITLEY** and N. Whitley that was in the business of selling the same types of stolen retail products as Closeout Express.

e.  Closeout Express principally sold stolen retail products online at "closeoutexpress.net" and "closeoutexpress.com," as well as through various "online e-commerce platforms" described below. Essential Daily Discounts sold the stolen retail products online at "essentialsdailydiscounts.com."

f.  The Amazon Marketplace was an e-commerce platform owned by Amazon that enabled sellers, such as Closeout Express, to sell new or used products on a fixed-price online marketplace alongside Amazon's regular offerings. Third-party sellers paid Amazon a monthly fee, as well as variable closing and referral percentages. Customers purchasing items from third-party seller storefronts on Amazon Marketplace paid Amazon directly for their purchases. Amazon deducted its fees from the third-party seller's overall sales and disbursed the remainder into the third-party seller's "Amazon seller account." The third-party seller could then move funds from their "Amazon seller account" to a bank account that the seller specifies in their registered Amazon Marketplace seller profile. On or about January 26, 2011, **R. WHITLEY** registered the Closeout Express storefront with Amazon Marketplace. The Closeout Express storefront on the Amazon Marketplace ceased operation in or about July 2018.

2

g.  The Walmart Marketplace was an e-commerce platform established by Walmart in 2009. The Walmart Marketplace was similar to the Amazon Marketplace in that it enabled third-party sellers to sell new or used products on a fixed-price online marketplace alongside Walmart's regular offerings. Unlike the Amazon Marketplace, however, third-party sellers had to be pre-approved by Walmart to sell through its online marketplace. In order to be approved, a putative third-party seller must submit various information, including their U.S. business tax ID number, IRS Forms W9 or W8, and an EIN Verification Letter from the Department of Treasury verifying the business address or place of physical operations, a planned integration method for their products, and primary product categories and related information. If Walmart accepted a third-party seller, there were no monthly service fees, but the third-party seller paid fees to Walmart equivalent to a percentage of the product's selling price. Closeout Express operated a storefront on the Walmart Marketplace from at least on or about September 11, 2017 until at least in or about November 2019.

h.  In 2010, Sears established its own online e-commerce platform, "Sears Marketplace." The Sears Marketplace offered a similar platform as the Amazon and Walmart Marketplaces in that it afforded third-party sellers, such as Closeout Express, the ability to sell new or used products on a fixed-price online marketplace alongside Sears's regular offerings. Sears charged $39.99 per month as a program fee as well as a percentage transaction fee based on the product category. Closeout Express operated a digital storefront on the Sears

Marketplace from at least in or about December 2014 until at least in or about October 2019.

    i.   An Organized Retail Crime ("ORC") operation refers to the professional shoplifting, cargo theft, retail crime rings, and other organized crime occurring in a retail environment.

### The Closeout Express ORC Operation

2. **R. WHITLEY** and N. Whitley operated an ORC operation—through Closeout Express, Essential Daily Discounts, and related entities—primarily from a warehouse located on White Street SW in Atlanta, Georgia ("White Street warehouse"). At the White Street warehouse, they and individuals working at their direction sorted, stored, and cleaned stolen retail product for shipment from the Northern District of Georgia to individuals across the United States via the United States Postal Service and UPS.

3. **R. WHITLEY** and N. Whitley recruited and paid "boosters"—who are essentially professional shoplifters—to steal specific retail products and categories of items, including OTC medication, shaving razors, oral care products, and health and beauty aids, from big box retailers, national drugstore chains, and national supermarket chains throughout the Atlanta-metro area, including CVS, Kroger, Publix, Target, and Walgreens.

4. It was further part of the ORC operation that the boosters would use large trash bags and travel bags to carry the stolen retail product.

5. **R. WHITLEY** and N. Whitley would meet the boosters at or near the White Street warehouse to pay them for the stolen retail product.

6. **R. WHITLEY** and N. Whitley would pay the boosters in cash for the stolen retail product.

7. **R. WHITLEY** and N. Whitley established a digital storefront for Closeout Express on various e-commerce platforms.

8. **R. WHITLEY** and N. Whitley — through Closeout Express and related entities — sold the stolen retail product through a variety of online channels, including the websites "closeoutexpress.net," "closeoutxpress.org," and "essentialsdailydiscounts.com," and multiple online e-commerce platforms where they maintained a "digital storefront" for Closeout Express, including on the Amazon Marketplace, the Walmart Marketplace, and the Sears Marketplace.

9. **R. WHITLEY** and N. Whitley — through Closeout Express and related entities — typically sold the stolen retail products below wholesale cost.

10. Between on or about January 26, 2011 and on or about June 28, 2018, Closeout Express sold over 140,000 items through its Amazon Marketplace storefront and received over $3.5 million from these sales.

11. Between on or about September 11, 2017 and on or about July 22, 2019, Closeout Express processed over 29,000 orders through its Walmart Marketplace storefront, totaling more than $750,000.

12. Between in or about December 2014 and in or about February 2018, over 1,800 transactions were executed through Closeout Express's storefront on the Sears Marketplace resulting in a net profit to Closeout Express of over $50,000.

13. As part of the ORC operation **R. WHITLEY** and N. Whitley also sold hundreds of thousands of dollars in stolen retail products through essentialdailydiscounts.com

14. **R. WHITLEY** and N. Whitley also established multiple bank accounts, including at JPMorgan Chase, and First Citizen Bank, as well as PayPal accounts, to receive payment for the stolen retail product sold through Closeout Express's and Essential Daily Discounts' websites and the online storefronts.

15. It was further part of the ORC operation that a residential property owned by **R. WHITLEY** and located in East Point, Georgia was used to sort, store, and clean the stolen retail product for shipment from the Northern District of Georgia to locations across the United States.

16. In particular, in order to execute the above-detailed scheme to steal retail product and transport and transmit it in interstate commerce, **R. WHITLEY**, N. Whitley, and known and unknown individuals working with them and at their direction committed the various overt acts in the Northern District of Georgia, including, but not limited to, the following:

　　a.　On or about May 25, 2016, **R. WHITLEY** met with boosters at the White Street warehouse where he received stolen retail product.

　　b.　On or about August 1, 2017, **R. WHITLEY** submitted the third-party application on behalf of Closeout Express for approval to sell on the Walmart Marketplace. Walmart approved Closeout Express's application on or about August 29, 2017.

6

c.  On or about January 8, 2018, two boosters, including one identified as "A.C.," dropped off six large trash bags at the White Street warehouse containing stolen retail product.

d.  On or about January 22, 2018, **R. WHITLEY** met with boosters in a Kroger Supermarket parking lot near the White Street warehouse and received five large trash bags containing stolen retail product for which **R. WHITLEY** paid cash.

e.  On or about January 23, 2018, an unknown co-conspirator, driving a vehicle registered to N. Whitley, picked up two large sacks containing stolen retail product from the White Street warehouse and subsequently dropped them off to be shipped from the United States Post Office, West End Station in Atlanta, Georgia.

f.  On or about January 24, 2018, **R. WHITLEY** met with boosters in a Kroger Supermarket parking lot near the White Street warehouse and received five large trash bags containing stolen retail product for which **R. WHITLEY** paid cash.

g.  On or about February 28, 2018, **R. WHITLEY** met with a booster in a Kroger Supermarket parking lot near the White Street warehouse and received stolen retail product, including Rogaine, for which **R. WHITLEY** paid cash.

h.  On or about March 1, 2018, N. Whitley met with a booster at the White Street warehouse and unloaded three large trash bags containing stolen retail product.

7

i.   On or about May 26, 2018, unknown members of the ORC operation, driving a vehicle registered to the same address as N. Whitley's other vehicles, picked up three large travel bags containing stolen retail product at the White Street warehouse, and shortly thereafter dropped off these items for shipment at the United States Post Office, West End Station in Atlanta, Georgia.

j.   On or about February 19, 2019, N. Whitley met with boosters and an "employee" of Closeout Express at the White Street warehouse and loaded vehicles with stolen retail product, including Prilosec OTC, an over-the-counter treatment for acid reflux. N. Whitley and others then proceeded to the residence located in East Point, Georgia.

k.   On or about February 19, 2019, an individual involved in the ORC operation dropped off approximately 160 outbound packages at the United States Post Office, West End Station, in Atlanta, Georgia. Each of these packages identified Essential Daily Discounts as the sender.

l.   On or about March 11, 2019, an individual involved in the ORC operation, driving a Kia Soul routinely observed at the White Street warehouse and East Point, Georgia residence, dropped off approximately 90 outbound packages at the United States Post Office, West End Station in Atlanta, Georgia. Each of these packages bore a return address with **R. WHITLEY's** name, the name Closeout Express, and the address of the White Street warehouse.

8

m. On or about March 12, 2019, an individual involved in the ORC operation, driving a Kia Soul routinely observed at the White Street warehouse and East Point, Georgia residence, dropped off approximately 40 outbound packages at the United States Post Office, West End Station in Atlanta, Georgia. Each of these packages bore a return address with **R. WHITLEY's** name, the name Closeout Express, and the address of the White Street warehouse.

n. On or about September 17, 2019, three male boosters dropped off three large trash bags containing stolen retail product at the White Street warehouse, including stolen Tide detergent.

o. On or about September 17, 2019, two female boosters dropped off three large trash bags containing stolen retail product at the White Street warehouse.

p. On or about November 19, 2020, **R. WHITLEY** and N. Whitley were storing over $1 million in stolen retail product at the residence located in East Point, Georgia.

q. On or about November 19, 2019, unknown individuals involved in the ORC operation were cleaning and preparing stolen retail product for shipment at the residence located in East Point, Georgia.

17. As a result of the above-described ORC operation and scheme, **R. WHITLEY** and N. Whitley transported in interstate commerce at least $5 million in stolen retail product between January 2011 and November 2019.

18. Beginning no later than in or about January 2011, and continuing until at least until in or about November 2019, the defendant, **ROBERT WHITLEY a/k/a MR. BOB**, aided and abetted by others known and unknown, transported, transmitted, and transferred, and caused to be transported, transmitted, and transferred in interstate commerce, goods and merchandise with a total value of at least $5,000, namely retail products, including OTC medications, shaving razors, oral care products, health and beauty aids, and other items, knowing that such goods and merchandise have been stolen, converted, and taken by fraud from big box retailers, national drugstore chains, and national supermarket chains.

All in violation of Title 18, United States Code, Section 2314 and Section 2.

### Forfeiture Provision

19. Upon conviction of the offense alleged in Count One of this Criminal Information, the defendant, **ROBERT WHITLEY a/k/a MR. BOB**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following:

> MONEY JUDGMENT: A sum of money in United States currency equal to the amount of proceeds the defendant **ROBERT WHITLEY a/k/a MR. BOB** obtained as a result of the offense alleged in Count One of this Criminal Information.

20. If, as a result of any act or omission of the defendant, any property subject to forfeiture:

- a.  cannot be located upon the exercise of due diligence;
- b.  has been transferred or sold to, or deposited with, a third person;
- c.  has been placed beyond the jurisdiction of the Court;
- d.  has been substantially diminished in value; or
- e.  has been commingled with other property which cannot be subdivided without undue complexity or difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

KURT R. ERSKINE
*Acting United States Attorney*

ALEX R. SISTLA
*Assistant United States Attorney*
Georgia Bar No. 845602

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

11